## McKEON v. TILLOTSON.

September, 1864.

The fact that a treaty made by the United States with one of the Indian tribes, has, annexed to it, a conveyance by such tribe, of certain of their lands, and such conveyance is noticed and approved of in the treaty, does not make the United States a party to the conveyance nor bound by nor equitably responsible for performance of its covenants.

Where, therefore, after making such conveyance, the tribe refused to deliver possession to the purchasers, who were obliged in consequence to

expend large sums to obtain possession,—*Held*, that the purchasers had no claim in equity to be reimbursed by the United States.

Where, in a treaty with the United States, an Indian tribe released their pre-emption right to certain lands, and agreed to give possession on payment of the purchase and improvement money, such payment to be made to the secretary of war of the United States,—*Held*, that the United States acted simply as the agent of the Indians, and were not equitably bound to allow interest on such payments, during the time that the Indians refused to deliver possession, according to the treaty.

John McKeon sued Robert L. Tillotson, in the supreme court, to foreclose a mortgage on lands in Dutchess county, made and executed by the defendant to the plaintiff, bearing date March 1, 1856. The execution of the mortgage was admitted, and the defendant set up various matters in avoidance of the mortgage, and to show that there was nothing due upon it. It was conceded that the mortgage was given to the plaintiff to secure a debt due by the defendant to the United States, and that the plaintiff was a mere naked trustee. The answer set up that in and prior to the year 1838, there was an association of persons, of whom the defendant was one, who were the owners of the pre-emption title to certain lands in the western part of this State, then occupied by the Seneca nation of Indians, and known as the Buffalo Creek reservation, the Tonawanda reservation, the Cattaraugus reservation, and the Allegany reservation, and that association had also the pre-emption title to another reservation, known as the Tuscarora reservation, then occupied by the Tuscarora nation of Indians. That the interest of the defendant therein was one-twentieth ; that the legal title to said lands was in Thomas L. Ogden, and Joseph Fellows, as surviving trustees for the said shareholders, subject to the Indian right of occupancy. That on or about January 15, 1838, a treaty was made between the United States and the said Seneca and Tuscarora nations of Indians, by which the said Indians agreed to remove from the State of New York to certain lands set apart for them by the government of the United States, in the territory west of the State of Missouri, in consideration of said lands so set apart for them, and of certain apropriations to be made by the government and applied under the direction of the president. That annexed to said treaty, and duly recognized and approved there-

in, was a deed of conveyance, bearing even date therewith, from the said Seneca nation, their chiefs and head men, duly assembled in council, and acting on behalf of said nation, to the said Ogden and Fellows, conveying to them the said four reservations, in consideration of the sum of two hundred thousand dollars. That annexed to said treaty, and also duly recognized and affirmed therein, was another deed of conveyance bearing even date with said treaty between the sachems and chiefs of said Tuscarora Indians, conveying to said Ogden and Fellows, in consideration of nine thousand six hundred dollars, the said tract of land known as the Tuscarora reservation.

That by the terms of the treaty and of said conveyances, the said Ogden and Fellows, as trustees for said pre-emption owners, were entitled to the immediate possession of the said several tracts of land. That said treaty was duly ratified by the senate of the United States, and duly approved and proclaimed by the president on April 4, 1840. That said treaty contained no provision as to the mode or manner in which the removal of the Indians, or the surrender of said reservation should take place. The answer further stated, that prior to the year 1840, the United States had commenced an action, against the defendant, as surety on a bond for Samuel L. Gouverneur, then late postmaster of the city of New York; that a trial was had in the action which resulted in a verdict for defendant. That Mr. Butler, the United States district attorney, threatened an appeal, and that, as a compromise of any claim which the United States had against the defendant upon said lands, as well as to settle the matter in controversy, the defendant agreed to execute to said Butler, for the benefit of the United States, a mortgage upon his individual interest, in the land in said Indian reservations. That said mortgage was dated July 18, 1840, and was given to secure the payment of a bond bearing even date therewith, conditioned to pay the sum of ten thousand two hundred and seven dollars and eighty cents, with interest at the rate of seven per cent.; and the defendant averred in his answer, that said mortgage was executed upon the express understanding and assumption, on his part, that the debt thereby secured should be paid from the proceeds of the lands thereby assigned and released under said treaty, and that

McKeon *v.* Tillotson.

the government of the United States would in good faith execute the provisions of the said treaty, and give the pre-emption owners of the said reservation lands possession thereof.

That said bond and mortgage was taken by said Butler, as trustee for the United States, and that he paid nothing on account thereof and had no personal interest therein. Defendant averred that said treaty was not executed by the government of the United States, that said Indians refused to give possession of the lands ceded by them under said treaty, and released and conveyed by said deeds, and that said government, although requested to carry into effect the provisions of said treaty, refused so to do. That in 1841, Ogden, as general trustee, with the view of obtaining possession of said lands, applied to John Bell, Esq., then secretary of war, for an execution of said treaty, stating to him that said pre-emption owners were prepared to pay the consideration money for said lands, provided a surrender of said lands by the Indians should be made. That said Bell replied that the government would do nothing, and that said owners must get possession of said lands through the instrumentality of the courts. That subsequently another application was made to John C. Spencer, Esq., then secretary of war, who also declined executing said treaty, and giving possession to said pre-emption owners of said lands, unless they would consent to re-convey said Cattaraugus and Allegany reservations. That in consequence of the refusal of said Indians to surrender possession of said lands, and the refusal of the government of the United States to execute said treaty, the said pre-emption owners did not receive possession under the same of any part of said lands. That on May 20, 1842, a new treaty was made by and between the government of the United States and the Seneca nation, which, after referring to the treaty of 1838, and the deed of conveyance to Ogden and Fellows, and to the differences which had arisen between the parties, declared in article 1, that Ogden and Fellows, in consideration of the agreements mentioned, stipulated that the Seneca nation might continue in the enjoyment of the Cattaraugus and Allegany reservations, the same as before the conveyance; and in article 2, the Seneca nation agreed to release and confirm to Ogden and Fellows, the two remaining reservations, the Buffalo

Creek and the Tonawanda. Article 3 provided for reducing the amount of the purchase money, so as to correspond with the relative value of the two reservations released to the value of the former fixed in the treaty of 1838. Article 4 provided for the appraisal of the lands and improvements in the two reservations then confirmed to Ogden and Fellows, and a report of the proceedings to the secretary of war and to Ogden and Fellows, one appraiser to be appointed by each. Article 5 provided that the possession of the two tracts then confirmed should be surrendered up to Ogden and Fellows, as follows: the unimproved lands, within one month after the report of the appraisers should be filed with the secretary of war, and the improved lands, within two years after the filing of such report, provided that the amount of the value of said improvements should be paid at the time of such surrender to the president of the United States, and the consideration of said release and conveyance of said lands should, at the time of the surrender thereof, be paid or secured to the satisfaction of the secretary of war. Article 7 provided that the modifications in the treaty of 1842 should be a substitute for that of 1838, and to that extent should be deemed to repeal it.

The treaty contained no provision as to the mode of the removal of said Indians, or the surrender of the reservations. That said treaty was duly ratified by the senate of the United States, and approved and proclaimed by the president, August 26, 1842. The defendant further alleged that in consequence of the refusal of the government of the United States to execute the treaty of 1838, the pre-emption owners were obliged to submit to the propositions contained in the treaty of 1842, and that in consequence thereof, they lost the right to the Cattaraugus and Allegany reservations, which had been conveyed to them by the deed of 1838, and the possession of which was fully guaranteed to them by the government of the United States by the treaty of 1838. That under the provisions of the treaty of 1842 the award of the appraisers, therein provided for, was filed in the war department on the April 1, 1844, and the amount awarded to be paid by said pre-emption owners was paid to the secretary of war for the benefit of said Indians in the year 1844, and the defendant paid his proportion, amount-

ing to the sum of six thousand six hundred and eighty-eight dollars and four cents. The defendant averred that the treaty of 1842 had not been executed by the government of the United States; that said pre-emption owners had applied to the government to execute the treaty and to remove said Indians from said lands, and to give said pre-emption owners possession thereof; but that said government had refused so to do; that said Seneca nation had refused to surrender the possession of the Tonawanda reservations, but still retained possession of the same.

That in the years 1844, 1845, and 1846, the said owners, without any aid from the government of the United States, obtained by degrees the surrender of the lands in the Buffalo reservation, and the same was not finally made until the year 1846. That such possession was obtained at a large expense, and the delay in acquiring the same subjected the defendant and the other owners to large expense and great pecuniary loss. That the proportion of the value of the Tonawanda reservation greatly exceeded in value that of the Buffalo Creek, owing to the superior value of the lands. That the mortgage, given to said Butler, was subject to prior liens upon the interest of said defendant in said lands. That all the lands belonging to the share of this defendant, in the Buffalo Creek reservation, had been sold by the trustees, and that the proceeds of such sales had been applied to the payment of said prior liens, with the exception of the amount paid on said mortgage to said Butler, and that the defendant had received nothing therefrom over and above such payments. The defendant then set forth a payment, in March, 1845, of seven thousand dollars, on account of said bond and mortgage, in February, 1846, a like payment of two thousand dollars, and in July, 1840, a further and like payment of one thousand dollars. That said mortgage to said Butler, being a lien on the interest of said defendant, in the lands of Buffalo reservation, and it being necessary, on the sale of said lands, to make a clear and free title thereto, an arrangement was made between the defendant and the United States, by which the latter agreed to cancel the mortgage to said Butler, upon the defendant executing and delivering the mortgage mentioned in the complaint in this action, as, and for

the balance due on said mortgage to said Butler, and which was ascertained to be, on March 1, 1856, the date of said bond mortgage, the sum of seven thousand four hundred and forty-six dollars and four cents, and that on the third of September, 1856, the defendant paid, on account thereof, ths sum of one thousand one hundred and seventy-five dollars. The answer alleged that as the defendant had paid, on account of said indebtedness, the sum of eleven thousand one hundred and seventy-five dollars, a sum greater than the original principal named in said mortgage to said Butler, he has paid the whole principal of said debt, and that the sum now claimed as due on said mortgage was for interest thereon.

The defendant alleged that said pre-emption owners had no means of enforcing the provisions of said treaties; that they could not obtain the possession of said lands by legal proceedings in the courts; that the United States government, by becoming parties to said treaties, guaranteed to said pre-emption owners the possession of said land so conveyed by said Indians, and that the omission to give such possession by the government was a fraud upon the rights of this defendant. That in consequence of the making of said treaties, and of the undertaking of the government to enforce the execution thereof, the said pre emption owners had paid large sums of money for the consideration of said lands, and had lost the interest on the same; that the sum paid to the government, in 1844, on account of said Tonawanda reservation has remained in the hands of the government ever since, and it had deprived the defendant of the use and enjoyment thereof. The defendant alleged that by the refusal of the government to execute said treaty of 1838 he had sustained a loss for interest alone, upon his proportion of the lands of the Buffalo Creek and Tonawanda reservations, of not less than ten thousand dollars. That in consequence of the said pre-emption owners being compelled to submit to the provisions of the treaty of 1842, and thereby losing the possession of said Buffalo Creek and Tonawanda reservations, this defendant had sustained a great loss, in all of not less thirty thousand dollars. Thus, the government, by wrongfully and fraudulently omitting and refusing to perform the duty which they were legally bound to perform, in

giving to the said pre-emption owners the possession of said lands, had deprived the defendant of the means of paying the interest of said mortgage debt from the lands specifically assigned for the payment of the same, and that as a matter of equity, and inasmuch as the original mortgage debt had been fully paid, the defendant claimed that he should not be compelled to pay interest upon said debt, said interest having accumulated solely in consequence of the neglect and refusal of said government to execute said treaties, which neglect and refusal, it was alleged, were a fraud upon the rights of the defendant. The defendant claimed and insisted that money paid by him to obtain possession of the lands of the Buffalo Creek reservation, and the interest upon his proportion of the purchase and improvement moneys of the Tonawanda reservation, deposited with the secretary of war in 1844, should be allowed to him as a credit upon the sum claimed to be due on said mortgage; and he insisted that the mortgage debt should be adjudged to be fully paid, and that said bond and mortgage should be given up and canceled. By stipulation between the parties it was agreed, in order to save a reference to compute the amount due upon said bond, that the apparent amount due on December 16, 1858, on the bond and mortgage, was seven thousand five hundred and eighty-one dollars and eighty-seven cents.

*John H. Reynolds,* for defendant, appellant.

*F. Kernan,* for plaintiff, respondent.

BY THE COURT.—DAVIES, J. [After stating the facts.]—The matters stated in this answer are not set up as a counter-claim on the part of the defendant. They do not fall within the provisions of the Code of Procedure. They do not arise out of contract, or from any transaction set forth in the complaint on the foundation of the plaintiff's claim, connected with the subject of the action.

The subject of the action is the collection of a debt, admitted by the defendant, at the time of the execution of the bond and mortgage, to be due by him, to the United States, and to secure which, this mortgage was given. That debt was origi-

nally secured by a mortgage upon other lands. In 1840, the defendant admitted his liability to the United States to pay the sum mentioned in his bond and mortgage to Mr. Butler. It is of no moment whether such indebtedness arose upon his liability as surety upon a bond or otherwise. It was a conceded indebtedness, and its justice has been admitted by the subsequent payments. In 1840, when the first mortgage had been given, the Indians had not removed from the reservation as the defendant now contends they should have done, in conformity with the treaty of 1838, and if there was any neglect of duty on the part of the United States, it had occurred at that time. Yet the defendant, setting up no such claim in discharge of his indebtedness to the United States government, gave a mortgage on his interest in the lands of the five reservations, to secure the whole amount of such indebtedness, and such mortgage remained a lien upon his interest in the lands of the said five reservations, until the United States, upon the application of the defendant, in 1856, released such lien, and canceled said mortgage, and took the mortgage now in process of foreclosure in this action, upon other lands of the defendant, for the balance due of said original debt. And it is a singular fact, that at the time this new security was given, all the transactions mentioned and referred to in the defendant's answer had happened and all the equities now interposed by him, if any, existed, and yet no mention seems then to have been made of them, and no claim set up that the debt mentioned in the new bond and mortgage was not due. The giving of that bond and mortgage was an act entirely inconsistent with the allegation now made, that at that time there was nothing due to the United States by the defendant. No cause of action is set up by this answer, against the United States, and the equities claimed by the defendant will next be considered, as well as the affirmative relief asked for, namely, that the mortgage debt be adjudged to be fully paid. and that the bond and mortgage should be given up and canceled.

The gravamen of the defendant's answer is, that the United States was bound by the terms of the treaty of 1838, to remove the Indians from the five reservations then conveyed to Ogden and Fellows, and that in consequence of such neglect and

refusal the defendant had sustained damages greater than the balance upon said original bond and mortgage. The duty of the United States thus to remove the Indians is stated in various forms in the answer. In one place it is alleged, that by the terms of the treaty of 1838, and by the conveyances to Ogden and Fellows, they were entitled to the immediate possession of said lands. Again, that the possession of said land to the defendant and his ten owners was fully guaranteed by the United States by the treaty of 1838. Again, it is alleged, that the United States, by becoming parties to the treaties of 1838 and 1842, guaranteed to the said pre-emption owners the possession of said lands; and again, that in consequence of the undertaking of the government to enforce said treaties, and its neglect and refusal so to do, the defendant had lost the interest on the moneys paid to the government, and the large sums paid to obtain possession of said lands. These are the various forms in which the defendant states the duty, obligation, agreement or guaranty of the United States, the failure to perform which creates the equitable defense contended for. There is no pretense that any such duty is recognized or referred to in either of the bonds and mortgages executed by the defendant to the agents of the United States, or that any agreement or understanding was ever had or existed between the defendant and the United States, or any of its officers or agents, that any such duty existed, or that the United States would undertake its performance. The nearest approach to this is the allegation in the answer that the mortgage to Butler was executed upon the express understanding and assumption *on his part* that the government of the United States would in good faith execute the provisions of the treaty of 1838, and give to the pre-emption owners the possession of the said reservation lands. This allegation falls far short of any understanding or agreement on the part of the United States to do the things specified, made or entered into at the time of the execution of the mortgage.

The word " express " as here used might seem to imply that an expression had been given to some understanding on the part of both parties at the time, but the other words used, negative any such inference. It was an understanding or assumption on the part of the defendant only, that the United

States would execute the treaty of 1831, and put the owners of the lands conveyed by the Indians into the possession thereof. The form of the allegation is evidently intended to convey the idea, that the United States were bound by the terms of the treaty of 1838, to put the defendant and his associates into the possession of the Indian lands. The same idea, as has been observed, is presented in different language several times, in the answer, and in one instance as though the United States by that treaty fully guaranteed such possession to them. The political and judicial history of the country, and the statutes of the State of New York and Massachusetts show, that at an early day a dispute had arisen between the two States, in respect to the title to a large tract of land within the territorial limits of the State of New York, of which the Indian reservation mentioned and referred to in the defendant's answer formed a part. In 1786 the dispute was amicably settled by a cession from Massachusetts to New York of the sovereignty and jurisdiction over the tract then occupied by the nations of Indians mentioned, and by a cession from New York to Massachusetts of the right of pre-emption to the soil from the Indians. The lands were then in the independent occupancy of the Seneca nation and the Tuscarora nation, and owned by them, and Massachusetts acquired by the cession the exclusive right of purchasing their title to said lands whenever they became disposed to sell the same. This right became vested in the said Ogden and Fellows by proper conveyances from the State of Massachusetts. By the constitution of the United States the power to regulate commerce with the Indian tribes was vested in Congress, and by virtue of that power, Congress has passed various laws regulating intercourse with the Indian tribes. Negotiations with them must be had by and with the assent and under the authority of the United States. They are treated as a *quasi* nation possessing none of the attributes of an independent people, and are to be dealt with accordingly.

The Indian tribes are in a state of pupilage toward the United States government, and hold the relation to it which a ward owes to his guardian. Fellows v. Blacksmith, 19 *How. U. S.*, 366. In 1838, Ogden and Fellows, being desirous of purchasing the pre-emption right of the Seneca nation to the four

mortgaged reservations, and from the Tuscaroras the reservation owned by them, procured the appointment of commissioners on the part of the State of Massachusetts, and on the part of the United States, to hold a treaty with said nations, and which was held on January 15, 1838, and which treaty was approved of, and proclaimed by the president of the United States April 4, 1840. By the terms of this treaty, these commissioners being present, the chiefs of the Seneca nation agreed to sell, and Ogden and Fellows agreed to purchase, the title of the nation to said four reservations, and a deed therefor having been first read and explained to said Indians, was made and executed by them, bearing date January 15, 1838, whereby, for the consideration of two hundred and two thousand dollars therein expressed, to them in hand paid, they granted, bargained, sold, released and confirmed unto said Ogden and Fellows, and to their heirs and assigns forever, as joint tenants, and not as tenants in common, and the commissioner on the part of the State of Massachusetts, and the commissioner on the part of the United States, certified and declared at the foot thereof that they respectively approved of the same. A similar treaty in all respects, containing a similar deed from the Tuscarora nation to Ogden and Fellows, for their reservation, was made and concluded at the same time, and certified and approved by the said commissioners in the same manner. Neither of these treaties contained any stipulations or agreements of anything to be done or performed on the part of the United States. All that was done on the part of the agent of the United States was to certify and declare that the said deed then executed in his presence, being fairly and perfectly understood by the said Indians, and that he approved of the same.

There is not a word in either of these treaties in reference to the possession of said reservations, or anything implying that the United States was to deliver the same to the grantees named in the conveyances recited therein, or assumed any obligations or duties in relation thereto. These were the only treaties made at that time to which Ogden and Fellows could in any sense be deemed parties, or had any right or pretense to assert any interest in the fulfillment of. At the same time, to wit, on January 15, 1838, a treaty was made between the

United States and several tribes of New York Indians, including the said Seneca and Tuscarora nations, and which was amended by the Senate of the United States, on June 11, 1838, concerning the removal of said tribes to certain lands west of the State of Missouri, and lands owned by them in the western States. Article 10 of said treaty related exclusively to said Seneca nation. By this article the said Seneca nation agreed with the United States to remove to their new home in the west within five years, and to continue to reside there. The said article then recites that at the time of making said treaty, Ogden and Fellows had purchased from the Seneca nation the right and title of said nation to certain lands in the deed of conveyance annexed to the treaty mentioned, for the price of two hundred and two thousand dollars; the treaty then declares that the nation agreed that said sum should be paid to the United States, which agreed to receive the sum, to be disposed of as follows: the sum of one hundred thousand dollars to be invested in safe stocks. and the increase thereof was to be paid to said Indians annually, at their new homes, and the sum of one hundred and two thousand dollars was to be paid to the owners of the improvements on said lands, according to an appraisement to be made, on said Indians severally relinquishing their respective possessions to said Ogden and Fellows. Article 14 of said treaty related to the Tuscarora nation, and by it said nation agreed to accept the country set apart for them in the Indian Territory, and to remove there within five years and to continue to reside there. It is recited that at the making of that treaty, Ogden and Fellows had purchased all the title and claim of said nation in and to the lands mentioned in the deed annexed. That the consideration of said lands had been secured by said Ogden and Fellows to their satisfaction, therefore the United States assented to said sale and conveyance and sanctioned the same.

It is difficult to perceive from these references to the provisions of these treaties—and they are all which relate to said nation of Indians, or the lands sold and conveyed by them to said Ogden and Fellows—any grounds for the equities and claims set up by the defendant in his answer against the the United States. It is very clear that the United States

made no agreement whatever with Ogden and Fellows, or with the defendant, or that by reason of anything contained in those treaties that government owed to them, or either of them, any duty whatever, If there has been any breach of duty, or violation of contract on the part of the United States, it has been with these tribes of Indians, and not with Ogden and Fellows, or their associates. A reference to the circumstances under which the treaty of 1842 was negotiated, and to its provisions, will furnish as little color for the claims set up by the defendant. This treaty is between the United States of America and the Seneca nation of Indians, and was made on May 20, 1842, and approved and proclaimed by the president on August 26, 1842. It recites the making of the treaty of 1838, proclaimed to have been duly ratified on April 4, 1840, and that on the date of that treaty, May 20, 1842, an indenture had been made and executed by and between the Seneca nation and said Ogden and Fellows, in the presence of and with the approbation of a commissioner on the part of the United States, and in the presence of and with the approbation of a commissioner on the part of the State of Massachusetts; which indenture is set forth in full, and recites the indenture between the same parties of January 15, 1838; and that divers questions had arisen between the chiefs of said nation and Ogden and Fellows; and that the provisions contained in said indenture remain unexecuted; and that said parties have mutually agreed to settle, compromise, and finally terminate all such questions and differences on the terms and conditions therein specified; among which are, that the said nation, notwithstanding the indenture of January 15, 1838, might continue in the occupation and enjoyment of the whole of said two reservations, the Cattaraugus and the Allegany, with the same right and title in all things which they had immediately preceding its execution. In consideration whereof and of the agreements therein contained, the said nation released and conveyed unto said Ogden and Fellows the said Buffalo and Tonawanda reservations. The indenture contained other provisions not necessary particularly to mention, except those of article fifth, which were, that the possession of the two reservations, thereby confirmed to Ogden and Fellows, were to be surrendered and delivered up to them,

as follows: the unimproved lands within one month after the filing of the report of the arbitrators, as provided for therein, and the improved lands within two years after the said report should have been filed. The seventh article provided, that that indenture should be in lieu of and as a substitute for that of January 15, 1838.

The United States, taking into consideration the premises, stipulated and agreed with the said Seneca nation: 1. That the United States consented to the several articles and stipulations contained in said indenture between said nation and Ogden and Fellows; 2. The United States further consented and agreed, that any number of said nation who should remove from the State of New York, under the provisions of the treaty of April 4, 1840, should be entitled, in proportion to their relative numbers, to all the benefits of said treaty; 3. The United States further consented and agreed, that the tenth article of said last mentioned treaty should be deemed to be modified in conformity with the provisions of said indenture of May 20, 1842, so far as that the United States would receive and pay the sum stipulated to be paid as the consideration money of the improvements therein specified, and would receive, hold and apply the sum to be paid, and the securities to be given for the lands therein mentioned, as provided for in such indenture.

These are all the stipulations, agreements or undertakings contained in said treaty, on the part of the United States, or affecting that government. It is seen that they are made only with the Indians, and that they are the only parties thereto. The provisions fall far short of establishing the propositions contained in the defendant's answer, in reference to the duty of the United States to remove said Indians, to give the possession of their lands to the defendant. As these treaties are referred to and made part of the defendant's answer, as the foundation of his claim against the United States, they have received a careful examination and dissection for the purpose of ascertaining what duties or obligations arise therefrom, on the part of the United States, to the defendant. It is difficult to perceive what obligations the United States incurred by these treaties, for the violation of which the defendant has any claim for damages. As well might that claim be interposed by any

other citizen of the United States, and and as well might any other debtor to that government, claim that his debt was discharged and satisfied by the failure of the United States to fulfill its treaty stipulations with the Indians. The United States, therefore, assumed no duty to the defendant, in reference to the removal of the Indians from their lands, conveyed to Ogden and Fellows, or to put the defendants and his associates into the possession thereof, and consequently no claim for damages can exist on the part of the defendant against the United States, for the omission to discharge a duty or obligation which never had an existence.

It is further alleged that the defendant and his associates were greatly damaged by reason of their being compelled to accede to the terms of the treaty of 1842. That treaty was made by the United States with the Seneca nation, and when duly ratified and proclaimed, became the supreme law of the land, binding upon the defendant and all other citizens. But it is manifest that it is not of the terms of the treaty of 1842 that the defendant complains, but of the provisions of the indenture made by and between Ogden and Fellows and the Seneca nation, to which the United States assented by that treaty. The United States were not parties to that indenture, and assumed no obligation in reference to it, to the defendant. It was an arrangement between the defendant and his associates, represented by Ogden and Fellows, and the Indians; it is to be presumed they would not have entered into it if they had not deemed it for their interest so to do. The recitals declare the reasons why it was made,—that questions and differences had arisen between the Indians and Ogden and Fellows, in relation to the indenture of January 15, 1838, not referring to any differences which had arisen between either of the parties thereto and the United States. It also recited that the provisions of said indenture remained unexecuted. We have seen that the only parties thereto were the Indians, and the said Ogden and Fellows, and this recital is to be understood that the same remained unexecuted by them. But what is conclusive upon the claims here set up by this defendant, is that said indenture declares that the parties thereto have mutually agreed to settle, compromise and finally terminate all such questions and

differences on the terms and conditions thereinafter specified. Now this compromise was binding and conclusive upon the parties thereto, unless impeached for fraud or mistake. Even if the United States had been a party thereto, they could have set up its finality, as it is not impeached for the reasons suggested. It has been performed, on the part of the Indian nations, by the surrender of the two reservations, the possession of which it was agreed thereby should be given to Ogden and Fellows, and all claim for damages, if any existed against the Indians for not surrendering the possession of the reservations, as it is claimed they were bound to do under the indenture of January 15, 1838, must be deemed to be settled and compromised by the new agreement of 1842.

It remains to be considered, what equities, if any, does the defendant present, arising out of the treaty of 1842. That treaty ratified on the part of the United States the indenture made between the Indians and Ogden and Fellows of May 20, 1842. It provided for a valuation by appraisers of the improvements which had been made by the Indians upon the lands of the two reservations, the possession of which it was thereby agreed should be surrendered, and for the payment of the amount awarded by the appraisers to the secretary of war, for the benefit of the Indians. This award was made and the money paid in 1844. Still the Indians did not remove from the Buffalo Creek reservation until the year 1846, and had not removed from the Tonawanda reservation, as they had agreed to do, by the terms of the indenture of 1842; and the defendant claims that the United States did not execute that treaty, and remove the Indians. We have already adverted to this claim, and shown how untenable it is. In 1844, 1845, and 1846 the pre-emption owners themselves, induced the Indians to remove from the lands of the Buffalo Creek reservation, and obtained the possession of it. The lands or interest of the defendant therein, thus became marketable, and were accordingly sold, from time to time, by the trustees, or Mr. Fellows, the survivor. The share of the defendant, in this and the other reservations, was subject to other liens, prior to that created by the mortgage to Mr. Butler, and the proceeds of the sale of his interest in the lands of the Buffalo reservation were

entirely exhausted in the discharge of these liens. The mortgage, therefore, remained a lien on his interest in the lands of the other reservations. The defendant, during the years 1845, 1846 and 1847, was making payments upon his bond and mortgage. He had paid, in all, the sum of ten thousand dollars, which was applied in discharge of the payment of the principal and interest due thereon. In 1855 the defendant was desirous of procuring a discharge of said mortgage, thereby releasing not only his interest in the lands of the Buffalo reservation, but in those of the other four reservations, and applied to the government to make some arrangement for that purpose. He then proposed to give his bond and a mortgage upon other lands of his in the county of Dutchess for the balance then due on said mortgage, and which he admitted was, on March 1, 1855, the sum of seven thousand four hundred and forty-six dollars and four cents. Upon that application the arrangement was made by which the mortgage then held by Mr. Butler was canceled, and the present mortgage accepted as a substitute therefor. Since its execution the defendant has made payments thereon already adverted to. One of the equities insisted upon by the defendant is, that the failure of the government to put the defendant in the possession of the lands of the Indian reservations has deprived him of the means of paying the interest on said lands, and this equity is connected with or arises from the allegation of the answer, that such lands were specifically assigned for the payment of such interest. It is only necessary to say that it is impossible to discover, from the facts set forth in the answer, any grounds for such a position. It is doubtless true, as the defendant alleges, that the mortgage was executed upon the express understanding and assumption *on his part*, that the mortgage debt thereby secured should be paid from the proceeds of the lands thereby assigned and released under said treaty. It is not pretended that there is any other foundation for this assumption than is found in the fact that said lands were mortgaged by the defendant to the United States to secure his indebtedness. It was an understanding and assumption on his part only, and it is not claimed that it was so understood on the part of the United States, unless the use of the word " expects " was inended to convey that meaning. That it does not, has been

shown, when the force of that word, as used here, was commented on in another connection. But by the terms of the indenture of 1842, assented to by the United States, the possession of two of the reservations covered by said mortgage, was released to the Indians, and in 1846 the possession of the Buffalo Creek reservation was fully obtained by the defendant and his associates. The United States, by the arrangement of 1855, fully discharged all the Indian lands from the lien of said mortgage, at which time the defendant conceded that there was a balance due to them. It is no fault of the United States if the defendant has not since then had the full enjoyment of what they then released to him. The defendant has thus had the benefit and enjoyment of the lands mortgaged, and not the mortgagee. There is no equity therefore in the claim that interest should not accrue upon the mortgage debt.

It is also insisted that the amount contributed by the defendant, to obtain possession of the Buffalo Creek reservation, should be set off or credited upon said mortgage, and that defendant should also be credited with his proportion of the interest on the amount paid by him to the secretary of war, under the award, made pursuant to the indenture of 1842, to pay for the Indian improvements.

The first of these claims has been already disposed of, by showing that the United States were under no obligation to the defendant, by way of contract or otherwise, to remove the Indians from their lands and put the defendant in possession thereof. If there had been, then there would have been force in the claim that the defendant should be allowed the amount of money expended by him, for doing what it was the duty of the United States to do. Under the facts stated, the expenditure incurred by the defendant must be regarded as made on his own account and for his own benefit, and which the United States is under no obligation, legal or equitable, to reimburse to him. In reference to the second claim, it is only necessary to observe that the moneys paid to the secretary of war, pursuant to the provisions of the indenture of 1842, were paid to him as the trustee for the respective Indian owners of the improvements thus compensated for. Such moneys belonged to said Indians, and if any interest accrued thereon

while the same was in the hands of their trustee, or he was chargeable with any such interest, it belonged to the owner of the principal, and was to be paid to him. As was well observed in the opinion of the supreme court in this case: "The defendant and his associates were under a strict legal obligation to pay this money, and the government derived no benefit from it. If any rights accrue to the defendant, in consequence of this payment, they must be asserted against the Indians, for the transaction was one between them and the white purchasers exclusively."

It follows from these views and considerations, that there is nothing set up in defendant's answer which presents a legal or equitable defense to the foreclosure and sale of the mortgaged premises, or which in any way modifies or alters the contract between the parties thereto. The judgments of the special and general terms were, therefore, correct, and should be affirmed.

All the judges present concurred.

T. A. Johnson, J., also read an opinion for affirmance.

Judgment affirmed, with costs.